# **Exhibit 1**

**Execution**

**ASSET PURCHASE AGREEMENT**

**by and among**

**LUMIO HX, INC., as Buyer**

**and**

**ZENITH SECURITY, LLC, an Idaho limited liability company**

**ZENITH SOLAR, LLC, a Texas limited liability company**

**DECA LIVING, LLC, a Texas limited liability company**

**as Sellers**

**and**

**OSCAR LUNA and JOHN BANKHEAD, as Shareholders**

**Effective as of December 10, 2021**

5648894

**TABLE OF CONTENTS**

**Page**

Article 1 ASSETS AND LIABILITIES..................................................................................................1
    1.1    Assigned Assets .................................................................................................1
    1.2    Excluded Assets .................................................................................................3
    1.3    Liabilities. ..........................................................................................................4
    1.4    Transfer of Title to the Assigned Assets...........................................................5

Article 2 CONSIDERATION .........................................................................................................5
    2.1    Total Cash Purchase Price. ................................................................................5
    2.2    Lumio Holdings Equity ......................................................................................7

Article 3 CLOSING......................................................................................................................7
    3.1    Closing...............................................................................................................7
    3.2    Deliverables. .....................................................................................................7
    3.3    Conditions to Closing. .......................................................................................9
    3.4    Termination. ....................................................................................................10

Article 4 COMPANY REPRESENTATIONS AND WARRANTIES ......................................................11
    4.1    Organization and Enforceability. ....................................................................11
    4.2    Title ..................................................................................................................12
    4.3    Liens .................................................................................................................12
    4.4    Intellectual Property. .......................................................................................12
    4.5    Financials..........................................................................................................13
    4.6    Legal Compliance ............................................................................................14
    4.7    Tax Matters ......................................................................................................14
    4.8    Real Property ...................................................................................................14
    4.9    Material Contracts. ..........................................................................................14
    4.10    Insurance..........................................................................................................15
    4.11    Litigation ..........................................................................................................15
    4.12    Employees and Employee Benefits..................................................................15
    4.13    Debt .................................................................................................................16
    4.14    Environmental Matters....................................................................................16
    4.15    Affiliate Transactions ......................................................................................16
    4.16    Inventory..........................................................................................................16
    4.17    Capitalization ...................................................................................................16
    4.18    Sufficiency of Assets ........................................................................................16
    4.19    Restrictions on Business Activities...................................................................16

Article 5 LUMIO REPRESENTATIONS AND WARRANTIES ..........................................................17
    5.1    Formation ........................................................................................................17
    5.2    Authorization ...................................................................................................17
    5.3    Non-contravention...........................................................................................17
    5.4    Brokers' Fees....................................................................................................17
    5.5    Valid Issuance of Securities..............................................................................17

5648894

Article 6 Indemnification.................................................................................................18
    6.1    Survival and Time Limitations ................................................................18
    6.2    Indemnification by the Seller ..................................................................18
    6.3    Indemnification by Lumio ........................................................................18
    6.4    Limitations on Indemnification. ...............................................................18
    6.5    Third-Party Claims. ..................................................................................19
    6.6    Direct Claims. ..........................................................................................20
    6.7    Other Indemnification Matters. ...............................................................22
    6.8    Offset ......................................................................................................22

Article 7 CERTAIN ADDITIONAL AGREEMENTS ............................................................22
    7.1    Operation of the Business Prior to the Closing Date ...............................22
    7.2    Access and Information ...........................................................................23
    7.3    Notification of Certain Matters.................................................................23
    7.4    Certain Post-Closing Matters ..................................................................23
    7.5    Further Assurances .................................................................................23
    7.6    Confidentiality..........................................................................................23
    7.7    Covenant Not to Compete .......................................................................24
    7.8    Continuing Assistance .............................................................................25
    7.9    Termination of Competing Identities........................................................25

Article 8 GENERAL .........................................................................................................25
    8.1    Press Releases and Public Announcements...........................................25
    8.2    Conflict Waiver and Attorney-Client Privilege ........................................26
    8.3    No Third-Party Beneficiaries ...................................................................26
    8.4    Entire Agreement.....................................................................................26
    8.5    Succession and Assignment ...................................................................26
    8.6    Counterparts ............................................................................................26
    8.7    Headings .................................................................................................26
    8.8    Notices ....................................................................................................26
    8.9    Governing Law; Jurisdiction ....................................................................27
    8.10    Amendments and Waivers.......................................................................28
    8.11    Severability .............................................................................................28
    8.12    Expenses ................................................................................................28
    8.13    Construction............................................................................................28
    8.14    Schedules ...............................................................................................28
    8.15    Waiver of Jury Trial .................................................................................28

*[Signature page to follow]* ..........................................................................................29

DEFINITIONS....................................................................................................................3

List of Exhibits and Schedules .......................................................................................10

\* \* \* \* \*

5648894

**ASSET PURCHASE AGREEMENT**

This ASSET PURCHASE AGREEMENT (this "*Agreement*") is made and entered into as of December 10, 2021 (the "*Effective Date*"), by and among the following parties (the "*Parties*"): (a) Lumio HX, Inc., a Delaware corporation ("*Buyer*" or "*Lumio*"); (b) Zenith Security, LLC, an Idaho limited liability company, Zenith Solar, LLC, a Texas limited liability company, and DECA Living, LLC, a Texas limited liability company (collectively, the "*Seller*" or the "*Company*"), and (c) the Shareholders of Seller set forth on Exhibit A (each, and "*Shareholder*", and collectively, the "*Shareholders*"). For additional clarity, references to "*Seller*" or "*Sellers*" herein shall include the Shareholders.

**INTRODUCTION**

A.        For purposes of this Agreement, (i) the Seller's trademarks, as well as all other registered or unregistered marks and logos, and other intellectual property rights are referred to as the "*Company Proprietary Rights*"; and (ii) Seller is in the business of marketing, designing, selling, financing, installing and maintaining state-of-the-art residential and/or commercial photovoltaic solar systems and storage batteries and related and ancillary products and services such as home security systems (collectively referred to herein as the "*Business*").

B.        The Parties desire to enter into this Agreement whereby the assets owned and/or held by Seller and used in connection with the Business are sold, contributed, conveyed, transferred and/or assigned to Lumio (all of such sold, contributed, conveyed, transferred and assigned assets, the "*Assigned Assets*") in exchange for certain cash compensation, as more fully set forth herein.

C.        The Parties have agreed that $44,261,636.00 is the value of the Assigned Assets and that subject to the provisions of this Agreement, Seller will receive a Total Cash Purchase Price of $44,261,636.00 in cash at or after the Closing Date as provided herein.

**AGREEMENTS**

In consideration of the mutual covenants, agreements and understandings contained herein and intending to be legally bound, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**ARTICLE 1**
**ASSETS AND LIABILITIES**

**1.1        Assigned Assets**. At Closing, the Seller will sell, contribute, convey, and/or assign to Lumio, and Lumio shall purchase, receive, and accept from the Seller, all of Seller's rights, title, and interest, of every kind and nature in and to the Assigned Assets, in each case free and clear of all Liens other than Permitted Liens.

(a)        **Assigned Assets Generally.** For clarity, and other than the Excluded Assets, the Assigned Assets include all of the assets owned by Seller or used by Seller related to the Business, including, without limitation:

(i)        Those certain Material Contracts listed on Schedule 1.1(a)(i) (the "*Assigned Material Contracts*").

(ii)    All Seller accounts, notes, and other receivables, including any prepayments and prepaid expenses.

(iii)    All Intellectual Property used in the Business, including, without limitation, the Company Proprietary Rights, Owned Software, Licensed Software, manuals, know-how and all other Company Intellectual Property.

(iv)    All inventory and related supplies, owned or licensed, including any inventory that may be in transit or that has been purchased, including, without limitation, that inventory set forth on Schedule 1.1(a)(iv).

(v)    All vehicles, equipment and tools, including, without limitation, those set forth on Schedule 1.1(a)(v).

(vi)    All rights to payment, including all accounts receivable, deposits, prepaid expenses and amounts to be received for purchase orders not yet paid related to the Business.

(vii)    All rights existing under those purchase orders to purchase goods or products relating to the Business, including those set forth on Schedule 1.1(a)(vii).

(viii)    All rights, causes of action and claims (including with respect to any damages, fees, expenses, credits, refunds (except for those tax related for periods prior to the Closing Date), and reimbursements), deposits, prepayments, warranties, guarantees, refunds, causes of action, rights of recovery, rights of set-off, and rights of recoupment of every kind and nature related to the Business.

(ix)    All contracts of Seller relating to the Business, including but not limited to customer contracts relating to the installation, maintenance, supplier contracts, ongoing service obligations, warranties and guarantees given to customers/clients of the Seller and those other contracts set forth on Schedule 1.1(a)(ix).

(x)    All Leased Real Property set forth on Schedule 1.1(a)(x) and Leased Personal Property and Equipment set forth on Schedule 1.1(a)(x).

(xi)    All rights under any warranties and indemnification obligations (whether implied or express) received from Company suppliers to the extent pertaining to Assigned Assets.

(xii)    The right, but not the obligation, to hire any of Seller's employees, consultants, and/or independent contractors.

(xiii)    All books and records related to the Business, including copies of all data residing on computers used in the Business (even if such computers are Excluded Assets).

(xiv)    All goodwill related to the Business.

(xv)     All permits, licenses, franchises, and other authorizations obtained from federal, state, or local governmental agencies or other similar agencies, and all data and records pertaining thereto (the "*Permits*"), to the extent such are assignable.

(xvi)     All telephone numbers, social media sites and web domains, Facebook or Meta pages and Instagram accounts related to the Business.

(xvii)     All rights to receive mail and other communications addressed to the Business.

(xviii)     All customer lists (including all electronic mail order and internet customer lists and all sales histories for such customers) price lists, vendor and supplier lists (including purchasing history and documents), and similar items (including both hard copy and electronic versions) related to the Business.

(xix)     All other assets related to the Business that are not Excluded Assets.

**1.2     Excluded Assets**. The Assigned Assets do not include the Excluded Assets and the Excluded Assets shall remain the exclusive property of the Seller. "*Excluded Assets*" means only the following assets:

(a)     All bank accounts and all cash and cash equivalents of the Seller above a mutually agreed baseline for net working capital, as set forth on Schedule 1.2(a).

(b)     [Intentionally Deleted]

(c)     The consideration payable to or for the benefit of the Seller pursuant to this Agreement and all of the Seller rights (or rights accruing to Seller's owners) under this Agreement and other Ancillary Agreements.

(d)     The Seller's income Tax records, and all rights to receive refunds or credits with respect to Taxes or other governmental charges related to the operation of the Business prior to the Closing Date (provided that Lumio will have access thereto and may make copies thereof before and after Closing).

(e)     All insurance policies of the Seller and rights to pursue claims thereunder (other than to the extent such insurance relates to an Assigned Asset under which Lumio or its Affiliates is a named insured or is a matter that is subject to indemnification hereunder).

(f)     The corporate record books of the Company, provided that Lumio will have reasonable access thereto and may make copies thereof before and after the Closing Date;

(g)     All equity interests in the Company, and the charter documents of the Company (and all rights thereunder).

(h)     The assets, properties, and rights specifically set forth on Schedule 1.2(h).

    **1.3**    **Liabilities**.

(a)    **Retained Liabilities**. Except only for the Assumed Liabilities expressly specified in Section 1.3(b), Lumio will not assume, whether by assignment, express or implied contract, by operation of law or otherwise, or be obligated to pay, perform, discharge or guarantee, any Liabilities of the Seller or its Affiliates, whether arising before, at or after the Closing Date (collectively, the "*Retained Liabilities*"). Without limiting the foregoing, and subject to the exclusion of the Assumed Liabilities, the Retained Liabilities will include all Liabilities of Seller or its Affiliates which:

(i)    Were incurred or relate to events which occurred on or before the Closing Date, whether or not related to the Assigned Assets.

(ii)    Relate to any Excluded Assets.

(iii)    Relate to any Liability or obligation related to any violation, breach, or default by the Company.

(iv)    Are in respect of Taxes (i) relating to the Business, the Assigned Assets or the Assumed Liabilities for any taxable period ending prior to the Closing Date (including for clarity, for sales or other similar taxes) and (ii) owed by Seller or its Affiliates (other than Taxes specifically allocated to Lumio under Section 7.4).

(v)    Constitute any Liability to any of the Seller Affiliates other than any Assumed Liabilities.

(vi)    Relate to any Debt or are Liabilities incurred by the Seller or its Affiliates in connection with the transactions contemplated by this Agreement.

(vii)    Relate to any of the Company's employees, including but not limited to, any unfunded obligations under any Employee Benefit Plan.

(viii)    Arise out of or in connection with any violation of or non-compliance of the Company with any Law.

(b)    **Lumio's Assumption of Certain Seller Liabilities.** From and after the Closing Date, Lumio will (or shall be responsible to cause its Subsidiaries to) assume the specific liabilities and obligations set forth below, and no others (the "*Assumed Liabilities*"):

(i)    All ordinary course liabilities relating to the Assigned Assets and the operation of the Business after the Closing Date, including but not limited to maintenance and warranty work (whether such maintenance or warranty work was incurred or results from actions occurring before, on or after Closing) but not arising out of any violation of applicable law by Seller.

(ii)    All Liabilities and obligations for Taxes for which Lumio is specifically liable pursuant to Section 7.4.

(iii)      All other Liabilities, Debts and obligations arising out of or relating to Lumio's ownership or operation of the Business and the Assigned Assets on or after the Closing Date.

(iv)      Any and all direct costs and other direct Liabilities related specifically and only to the lawsuit Zenith Solar, LLC, DECA Living, LLC, John Bankhead, and Oscar Luna v. John Frampton, Case No DC 2110536, in the District Court of Dallas County, Texas, 116th Judicial District, including any direct obligations, losses, settlements, and/or legal fees as follows: (A) for any and all direct costs or other direct Liabilities incurred by Sellers which are or may be due and payable to Mr. Frampton in excess of Two Million Dollars ($2,000,000.00), Lumio shall pay for the next Five Million Dollars ($5,000,000.00) of such direct costs and other direct liabilities in excess of such amount; and (B) for any and all direct costs or other direct Liabilities incurred by Sellers for legal fees, court fees, and related costs and expenses in excess of Five Hundred Thousand Dollars ($500,000.00), Lumio shall pay for one half (1/2) of such excess.

**1.4      Transfer of Title to the Assigned Assets**. The Company will sell, assign, transfer, convey and deliver the Assigned Assets to Lumio, or its designee, at the Closing Date by means of a bill of sale, assignment and assumption agreement and such other endorsements, certificates and instruments of transfer as shall be necessary or appropriate to vest good title to the Assigned Assets in the applicable assignee, free and clear of any Liens other than Permitted Liens. If the Company is party to a contract related to the Business which has not been disclosed on the Disclosure Schedules attached hereto, Lumio, at its option, may elect to include such contract as an additional Assigned Asset by written notice to Seller.

**ARTICLE 2**
**CONSIDERATION**

**2.1      Total Cash Purchase Price**.

(a)      **Total Cash Purchase Price.** The total cash purchase price payable by Lumio for all of the Assigned Assets will be $44,261,636.00 in cash or other certified funds (the "*Total Cash Purchase Price*"). The Total Cash Purchase Price will be payable to the Seller as set forth in Section 2.1(b) below.

(b)      **Payments**. The Total Cash Purchase Price will be payable as follows by Lumio to Seller:

(i)      $39,385,472.40, will be payable in immediately available funds at the Closing Date (the "*Closing Cash Purchase Price*").

(ii)      $4,376,163.60 (the "*Post-Closing Payment*") will be payable in immediately available funds after Closing over a period of eighteen (18) months as follows:

(A)      On that date which is six (6) months following the Closing Date (or, if not a business day then the next following business day), Lumio shall release and deliver to Seller one third (1/3) of the Post-Closing Payment, less the amount, if any, as to which Claims shall therefore have been made by Lumio pursuant to the indemnification provisions in Article 6 below.

5

(B)      On that date which is twelve (12) months following the Closing Date (or, if not a business day then the next following business day), Lumio shall release and deliver to Seller one third (1/3) of the Post-Closing Payment, less the amount, if any, as to which Claims shall therefore have been made by Lumio pursuant to the indemnification provisions in Article 6 below.

(C)      On that date which is eighteen (18) months following the Closing Date (or, if not a business day then the next following business day), Lumio shall release and deliver to Seller the balance of the Post-Closing Payment, less the amount, if any, as to which Claims shall therefore have been made by Lumio pursuant to the indemnification provisions in Article 6 below.

If the amount of any such Claims exceeds the amount of the Post Closing Payment, the entire remaining balance of the Post Closing Payment may be retained by Lumio until the final disposition of such Claim(s).

(iii)      $500,000.00 (the "*Earnout*") will be payable in immediately available funds after Closing in eight equal payments made on a quarterly basis on the last day of each such financial quarter (or, if such date shall not be a business day, then the next following business day) following the Closing Date, with the first such payment of Earnout being due and payable starting on the last day of the second financial quarter of calendar year 2022. With respect to the Earnout, Seller expressly acknowledges and agrees that conditions precedent to its receipt of the Earnout shall be:

(A)      its execution of a subordination agreement with respect to White Oak Global Advisors, LLC ("*White Oak*") and Fiera Comox Private Credit Opportunities Open-End Fund, LP ("*Fiera Comox*"), the form of which is attached hereto as Schedule 2.1(b)(iii), and

(B)      Seller shall not have breached the provisions of either Sections 4, 6.5, or 6.6 that certain Agreement Regarding Confidentiality, Non Competition, and Assignment of Inventions by and between the Company and Employee dated and effective as of the Closing Date, which forms a material part of the Employment Agreements, and/or Section 7.7 of this Agreement.

(c)      **Setoff for Restricted Cash**.  In lieu of actually transferring Restricted Cash to Sellers at the Closing Date, the Buyer may retain all or a portion thereof which are otherwise due and payable to Sellers under Section 2.1(b). For the purposes hereof, the Parties have estimated that the amount of Restricted Cash as of the Closing Date to be $350,000.00, which such amount includes all estimated Transaction Expenses. However, if it is mutually determined in writing by the Parties after the Effective Date that the amount of Seller's Liabilities estimated above as of the Closing Date exceeds or will exceed such estimates, then, in such event, Buyer may offset such excess against any remaining Restricted Cash or Post-Closing Payments otherwise payable under Section 2.1(b). Buyer will provide a full accounting of the estimated Transaction Expenses within 30 days after Closing.

(d)      **Tax Allocation**. For Tax purposes, the Total Cash Purchase Price will be allocated among the Assigned Assets consistent with the mutual agreement of the Parties and the allocation

6

set forth on Schedule 2.1(d), subject to Section 1060 of the Code. The Parties and their Affiliates will not take any position in any income tax return or income tax audit inconsistent with such allocation unless required to do so by applicable Law.

(e)      **Debt Financing Agreements.** Seller and Shareholders hereby acknowledge and agree that the right of Seller to receive payments in respect of the Post-Closing Payment and any payment in respect of net working capital to be made after the Closing Date shall be subject to Lumio's debt financing agreements and Lumio shall not be obligated to make payments of the Post-Closing Payment and any payment in respect of net working capital to be made after the Closing Date if such payments are not permitted thereunder because (x) a default or event of default has occurred and is continuing thereunder at the time of such contemplated payment or if the making of such payment would result in a default or an event of default thereunder or (y) the required liquidity threshold has not been satisfied at the time of such contemplated payment (or will not be satisfied following the making of such payment).

**2.2**      **Lumio Holdings Equity**. At or on the Closing Date, and in connection with the Employment Agreements with Oscar Luna ("*Oscar*") and John Bankhead ("*John*") (together with Oscar, the "*Equity Recipients*"), the Equity Recipients shall enter into stock restriction agreements (the "*Stock Restriction Agreements*") with Lumio Holdings, Inc., which such agreements shall provide that the shares of Lumio Holdings equity (the "*Lumio Holdings Equity*") held by such Equity Recipients shall vest over a three year period commencing on the Closing Date, but provided that the Equity Recipients shall receive twenty five percent (25.00%) vesting credit effective as of the Closing Date.

**ARTICLE 3**
**CLOSING**

**3.1**      **Closing**. Although the Parties intend to execute and deliver this Agreement as soon as practicable (the "*Effective Date*"), the Closing Date of the transactions contemplated by this Agreement (the "*Closing*") shall take place at the offices of Lumio in Lehi, Utah, or such other place, or by remote communication, as agreed to by the Parties, commencing at 10:00 a.m. mountain daylight time on the next Business Day following the satisfaction or waiver of all conditions of the Parties to consummate the transactions contemplated hereby (other than conditions with respect to actions the respective Parties will take at the Closing itself) as evidenced by the Parties mutual consent (the "*Closing Date*"). The Parties have targeted that the Closing Date will occur by December 10, 2021 (the "*Target Date*"), provided that Lumio may extend the Target Date by up to twenty-one (21) days upon notice to Seller. All transactions contemplated herein to occur on and as of the Closing Date shall be deemed to have occurred simultaneously and to be effective as of the close of business on such date. The Closing may take place by exchange of PDFs or other electronic means.

**3.2**      **Deliverables**.

(a)      **By Seller**. At Closing Date, the Seller will deliver or cause to be delivered the following to Lumio, duly executed as applicable by the Seller:

(i)      Documents of assignment and conveyance for assignment of the Assigned Assets, as reasonably requested by Lumio, including a Bill of Sale ("*Bill of Sale*") and an Assignment and Assumption Agreement (the "*Assignment and Assumption Agreement*").

7

(ii)     A signature page or joinder agreement to the Lumio Shareholders Agreement, Bylaws, and any other internal governance documents, as reasonably required by Lumio.

(iii)    a signature page for each of the Equity Recipients to each of the applicable Stock Restriction Agreements.

(iv)    All payoff and release letters in form and substance satisfactory to Lumio with respect to the complete payment and satisfaction of all of the Company's Debts and Liens related to the Assigned Assets, if any.

(v)     Evidence that the transactions contemplated by this Agreement have been duly authorized by applicable corporate or limited liability company action of the Company and its Affiliates.

(vi)    Copies of the Company's Organizational Documents, duly certified by the Idaho and Texas Departments of Commerce, Divisions of Corporations and Commercial Code if filed therewith, or by an officer of the Company otherwise, as applicable.

(vii)   All Required Consents, if any, to the transactions contemplated by this Agreement.

(viii)  All governmental and local filings, authorizations, permits and/or approvals that are required or desirable for the consummation of the transactions contemplated by this Agreement and to operate the Business.

(ix)    All other consents, certificates, documents, instruments and other items required to be delivered by the Company or its Affiliates pursuant to this Agreement, and all such other documents, certificates and instruments as the Buyer may reasonably request in order to give effect to the transactions contemplated by this Agreement.

(x)     All assignments and instruments of transfer of Company Intellectual Property.

(xi)    Employment Agreements between the Buyer and Oscar and John (the "*Employment Agreements*").

(xii)   A certificate of good standing or other similar evidence from the State of Idaho and Texas with respect to the Company as of a date not more than ten (10) days prior to the Closing Date.

(xiii)  All instruments and documents necessary or desirable to release any and all Liens on the Purchased Assets, other than Permitted Liens, including appropriate copies of the appropriate as-filed UCC financing statements in respect of the release of the Liens listed on Section 3.2(a)(xii) of the Schedules.

(xiv)   A properly executed statement described in Treas. Reg. Section 1.1445-2(b)(2) certifying that the Company is not a foreign person for the purposes of Code Section 1445, duly executed by the Company.

(xv)     A Secretary's Certificate, attached hereto as <u>Exhibit C</u>, in form and substance satisfactory to Buyer, certifying that all representations in this Agreement and the Exhibits and Disclosure Schedules attached hereto are true, correct, and complete representations, as of the Effective Date.

(b)     **By Lumio.** At the Closing Date, Lumio will deliver or cause to be delivered the following to Seller, duly executed as applicable by Lumio:

(i)     The Closing Cash Purchase Price by wire transfer of immediately available funds to an account designated by the Seller in writing prior to Closing.

(ii)     The countersignature to any assignment documents.

(iii)     Evidence that the transactions contemplated by this Agreement have been duly authorized by applicable corporate action of Lumio.

(iv)     Copies of Lumio's Organizational Documents, duly certified by the Delaware Secretary of State if filed therewith, or by an officer of Lumio otherwise, as applicable.

(v)     All other consents, certificates, documents, instruments and other items required to be delivered by Lumio pursuant to this Agreement or as reasonably requested by the Seller.

(vi)     If applicable, countersignature to the Bill of Sale and the Assignment and Assumption Agreement.

(vii)     The Employment Agreements.

(viii)     Such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to the Company, as may be required to give effect to the Transaction Documents.

**3.3     Conditions to Closing**.

(a)     **For the Seller.** The obligations of the Seller to consummate the transaction are subject to satisfaction or waiver of the followings conditions on or at the Closing Date:

(i)     All of the representations and warranties of Lumio in <u>Article 5</u> must have been accurate in all material respects as of the Effective Date and must be accurate in all material respects as if made on or at the Closing Date.

(ii)     Lumio shall have performed and complied in all material respects with all of the covenants and agreements in this Agreement to be performed by Lumio prior to or at the Closing Date.

(iii)     Lumio shall have delivered the deliverables required to be delivered at the Closing Date pursuant to <u>Section 3.2(b)</u>.

(iv)     All other consents, certificates, documents, instruments and other items required to be delivered by the Buyer pursuant to this Agreement.

(b)     **For Lumio**. The obligations of Lumio to consummate the transaction are subject to satisfaction or waiver of the followings conditions on or at the Closing Date:

(i)     All of the representations and warranties of the Seller and the Shareholders in Article 4 must have been accurate in all material respects as of the date hereof and must be accurate in all material respects as if made on the Closing Date.

(ii)     The Seller shall have performed and complied in all material respects with all of the covenants and agreements in this Agreement to be performed by Seller prior to or at the Closing Date.

(iii)     There shall not have been a Material Adverse Change in the Business of the Company.

(iv)     Lumio shall have completed the due diligence investigation of the Seller to its reasonable satisfaction.

(v)     The Seller shall have delivered the deliverables required to be delivered on or at the Effective Date pursuant to Section 3.2(a) above.

(vi)     The financing with White Oak and Fiera Comox shall have been received by the Buyer.

(vii)     The following entities shall have been executed and delivered to the Buyer asset purchase agreements in form and substantially similar to this Agreement:  Lift Energy Construction, Inc. ("*Lift*"), Atlantic Key Energy, LLC ("*AK*"), and Seller collectively referred to as the "*Seller Group of Companies*."

(viii)     All other consents, certificates, documents, instruments and other items required including the Bylaws of Lumio to be delivered by the Buyer pursuant to this Agreement.

**3.4     Termination**.

(a)     **Events**. The respective obligations of the Parties to consummate the Closing may be terminated and abandoned at any time at or before the Closing only as set forth below. Nothing contained in this Section shall be construed as a release or waiver by any party hereto of any of its rights against any other Party arising out of any breach of this Agreement by the other Party.

(i)     By and at the option of Lumio if the Closing Date shall not have occurred by the Target Date.

(ii)     By and at the option of either Party if the Closing shall not have occurred, including payment of the Closing Cash Purchase Price, by the Closing Date.

(iii)    At any time, without liability of any party to the others, upon the mutual written consent Lumio and the Seller.

(iv)    By Lumio or Seller, if any condition set forth above applicable to such Party shall become incapable of being satisfied by the date referenced in Section 3.4(a)(i) or Section 3.4(a)(ii) and is not waived; provided, that such termination right shall not be available to such Party if it has not used its commercially reasonable efforts to cause such condition to be satisfied.

(b)    **Effect of Termination**. In the event of the termination of this Agreement pursuant to Section 3.4(a), all obligations of the Parties hereunder (except under this Section 3.4 and under Article 8) and all representations and warranties shall terminate without any Liability of any party to any other Party, and all expenses incurred by any Party hereto shall be for its own account, except that nothing herein shall relieve any Party from any Liability with respect to breaches on or prior to such date of termination by any Party of covenants or agreements contained herein.

**ARTICLE 4**
**COMPANY REPRESENTATIONS AND WARRANTIES**

The Seller and the Shareholders, jointly and severally, represent and warrant to Lumio that the statements contained in this Article 4 are correct and complete as of the Effective Date of this Agreement and that Seller will use reasonable commercial efforts to cause the same to be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Article 4), except as set forth in the corresponding section of the Disclosure Schedule. For purposes of this Article 4, the "*Company's Knowledge*", "K*nowledge of Company*", "*Seller's Knowledge*" or "*Knowledge of Seller*" and similar phrases shall mean the knowledge of Oscar and/or John.

**4.1    Organization and Enforceability.**

(a)    **Formation**. Seller is duly organized under the laws of the State of Idaho and Texas. Seller is duly authorized to conduct its business and is in good standing under the Laws of each jurisdiction where such qualification is required, except where the failure to be so duly qualified and in good standing would not result in a Material Adverse Effect. Seller has full entity power and authority and all Permits necessary to carry on the businesses in which it is engaged and to own, lease and use the properties owned, leased and used by it. Seller is not in default under or in violation of any provision of its Organizational Documents.

(b)    **Authorization**. Company has full power, authority and legal capacity to execute and deliver the Agreement and the Ancillary Agreements to which it is a party and to perform its obligations hereunder and thereunder. The execution and delivery by the Seller of the Agreement and the Ancillary Agreements to which it is a party and the performance by the Seller of the transactions contemplated hereby and thereby have been duly approved by all requisite organizational actions of the Seller.

(c)    **Binding**. Assuming the due authorization, execution and delivery by Lumio, this Agreement constitutes the valid and legally binding obligation of the Seller, enforceable against the Seller in accordance with the terms of this Agreement, subject to the Enforceability Exceptions. Upon the execution and delivery by the Seller of each Ancillary Agreement to which

11

it is a party (and assuming due authorization, execution and deliver by Lumio and the other signors), such Ancillary Agreement will constitute the valid and legally binding obligation of the Seller, enforceable against the Seller in accordance with the terms of such Ancillary Agreement, subject to the Enforceability Exceptions.

(d)     **Capitalization**. Disclosure Schedule 4.1(d) sets forth the ownership of Seller, and all of the Subsidiaries, direct and indirect, of Seller.

(e)     **Non-contravention; Required Consents**. Except for the Consents identified on Disclosure Schedule 4.1(e) (the "*Required Consents*"), neither the execution and the delivery of this Agreement nor the Ancillary Agreements to which the Seller is a party, nor the consummation of the transactions contemplated hereby or thereby, will (i) violate or conflict with any Law or Order to which the Seller is subject, (ii) violate or conflict with any provision of the Organizational Documents of Seller, or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice or payment under any Contract, Permit, instrument, or other arrangement to which the Seller is a party or by which it is bound or to which any of its assets is subject (or result in the imposition of any Lien upon any of its assets), except in the case of each of the foregoing clauses (i) and (iii) for such violations, conflicts, breaches and defaults that would not have a Material Adverse Effect on the Seller. Except as set forth on Disclosure Schedule 4.1(e) and notices, filings, Consents or Permits that, if not obtained or made, would not have a Material Adverse Effect on the Seller, the Seller is not required to give any notice to, make any filing with, or obtain any Consent or Permit of any Governmental Body or other Person in order to consummate the transactions contemplated by this Agreement or the Ancillary Agreements to which the Seller is a party.

(f)     **Brokers' Fees**. The Seller has no Liability to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement.

**4.2     Title**. Seller and its Affiliates have good and marketable title to, or a valid leasehold interest or license in the Assigned Assets, free and clear of all Liens other than Permitted Liens. Seller will assign the Assigned Assets at Closing to the Buyer or its Affiliates free and clear of all Liens other than Permitted Liens. The Assigned Assets constitute all of the assets necessary to operate the Business.

**4.3     Liens**. Seller has good and marketable title to, or a valid leasehold interest or license in the Assigned Assets, which at Closing will be free and clear of all Liens other than Permitted Liens. Seller will assign the Assigned Assets at Closing to Lumio or its Affiliates free and clear of all Liens other than Permitted Liens. The Assigned Assets constitute all of the assets used in, or reasonably necessary to operate, the Business.

**4.4     Intellectual Property**.

(a)     **Registered Intellectual Property**. Disclosure Schedule 4.4(a) sets forth a list of all Registered Intellectual Property and Owned Software owned by Seller and all Licensed Software licensed by Seller. None of the Licensed Software is owned by any Affiliates of Seller. Seller is the sole and exclusive owner of all of the Registered Intellectual Property. All of the Registered Intellectual Property is valid and enforceable and, to the Knowledge of the Seller, none of the Registered Intellectual Property is being misappropriated, violated or infringed by any third party in any material manner.

12

(b)      **Company Intellectual Property**. Seller either owns or, as necessary, has sufficient and enforceable rights to use all Intellectual Property used in the conduct of the Business as currently conducted (the "*Company Intellectual Property*"). No claims are pending or, to the Knowledge of the Seller, threatened, (i) challenging the ownership, enforceability, scope, validity, or use by Seller of any Company Intellectual Property owned by Seller, or (ii) alleging that Seller is violating, misappropriating or infringing the rights of any Person with regard to any Intellectual Property.

(c)      **Infringement**. To the Knowledge of Seller, the operation of the Business as currently conducted does not violate, misappropriate or infringe the Intellectual Property of any other Person. To Seller's Knowledge, no Person is infringing the rights of Seller with respect to any Intellectual Property owned by Seller.

(d)      **Confidential Information**. Seller has taken commercially reasonable steps to maintain and preserve any Company Intellectual Property, including to preserve the confidentiality of any confidential information of Seller.

(e)      **Data**. Except as set forth in Disclosure Schedule 4.4(e), Seller maintains and follows policies and procedures regarding data security, privacy, data transfer and the use of data that are commercially reasonable to protect privacy and data and ensure that Seller is in compliance with all applicable Laws applicable thereto. Other than as set forth on Disclosure Schedule 4.4(e), to the Knowledge of the Seller, since the Reference Date, there have been no material: (i) losses or thefts of data or security breaches relating to data used in the Business; (ii) violations of any security policy regarding any such data; (iii) unauthorized access or unauthorized use of any such data; and (iv) unintended or improper disclosure of any personally identifiable information in the possession, custody or control of Seller, or a contractor or agent acting on behalf of Seller.

(f)      **Software**. Disclosure Schedule 4.4(f) sets forth a list of all Owned Software owned by Seller and all Licensed Software licensed by Seller. None of the Licensed Software is owned by any Affiliates of Seller. Seller possesses or controls: (i) the source code, object code and (as available) documentation for all Owned Software; and (ii) to the extent necessary as applicable in the Business, object code or source code and (available) documentation, or have other business arrangements in place, to develop, support, and maintain, material Licensed Software. No person other than Seller has any ownership right or similar interest in or with respect to the Owned Software. Seller has disclosed source code to Owned Software only pursuant to written confidentiality terms that reasonably protect Seller rights in such Owned Software. To the Knowledge of the Seller, no Owned Software is subject to any obligation that would require any Company to divulge to any person any source code or trade secret that is part of any Owned Software.

**4.5      Financials**.

(a)      **Financial Statements**. The Seller has provided to Lumio correct and complete copies of the following financial statements of Seller: (a) the audited consolidated balance sheets and related consolidated statements of income, changes in stockholders' and members' equity and cash flows of October 31, 2021; and (b) the unaudited balance sheets and statements of income as of and for the ten (10) month period ended October 31, 2021 (the "*Interim Balance*

*Sheet Date*"). Such financial statements are correct and complete in all material respects, are consistent with the books and records of Seller (which are in turn correct and complete in all material respects), have been prepared in accordance with GAAP consistently applied, and present fairly in all material respects the financial condition, results of operation of Seller as of and for their respective dates and for the periods then ending; provided, however, that the interim financial statements are subject to normal, recurring year-end adjustments and lack notes (none of which will be material individually or in the aggregate).

(b)     **Undisclosed Liabilities**. Seller does not have any Liabilities reflected on a balance sheet except for (a) Liabilities reflected on Seller's most recent financial statements referenced in Section 4.5(a) or incurred subsequent thereto in the Ordinary Course of Business, or (c) result from the obligations of Seller under this Agreement or the Ancillary Agreements.

(c)     **Changes**. Other than as set forth on Disclosure Schedule 4.5(c), Since the Interim Balance Sheet Date, the Business has been conducted in the Ordinary Course of Business, and there has not been any Material Adverse Change and no event has occurred which could reasonably be expected to result in a Material Adverse Change.

**4.6**     **Legal Compliance**. Other than as set forth on Disclosure Schedule 4.6(c), Seller is in compliance in all material respects with, all applicable Laws, and no Proceeding has been filed or commenced or, to the Knowledge of the Seller, threatened alleging any failure so to comply. Seller has all material Permits required to operate the Business. Since the Reference Date, Seller and its Subsidiaries have not received any written notice or communication alleging any non-compliance of any of the foregoing. No Company, nor, to the Knowledge of the Seller, anyone acting on its behalf, has made any Illegal Payments.

**4.7**     **Tax Matters**. Seller has filed with the appropriate taxing authorities all Tax Returns that they were required to file. All such Tax Returns are correct and complete in all material respects. All Taxes due and owing by Seller have been paid. There are no Liens for Taxes (other than Taxes not yet due and payable) upon any of the assets of Seller. No deficiency or proposed adjustment for any amount of Tax has been proposed, asserted or assessed by any taxing authority against Seller that has not been paid, settled or otherwise resolved. There is no Proceeding or audit now pending, proposed or, to the Knowledge of the Seller, threatened against Seller with respect to any Taxes, and no such Proceeding or audit has occurred since the Reference Date. All Taxes that are required to be withheld or collected by Seller have been duly withheld and collected and, to the extent required, have been properly paid or deposited as required by applicable Laws. Since the date of its formation, Seller has been, and through the Closing Date will be, an entity qualified to be treated as a partnership for federal (and, where applicable, state and local) income Tax purposes.

**4.8**     **Real Property**. Seller does not own any real property.

**4.9**     **Material Contracts**.

(a)     **Material Contracts**. Disclosure Schedule 4.9(a) lists all Material Contracts to which Seller is a party. The Seller has provided Lumio with correct and complete copies of each Material Contract.

(b)     **Binding**. Each Material Contract is a valid and binding agreement of Seller, and is in full force and effect, is enforceable against Seller, subject to the Enforceability Exceptions, and

14

to Seller's Knowledge is valid, binding and enforceable against the third party thereto, subject to the Enforceability Exceptions, and to the Knowledge of the Seller is not subject to any claim of, or right to, termination or rescission by any third party thereto. To the Knowledge of Seller, no Material Contract has been breached by Seller or, to the Knowledge of the Seller, any third party thereto. Seller has performed all material obligations under each Material Contract required to have been performed by Seller. To the Knowledge of the Sellers, there is no event which, upon giving of notice or lapse of time or both, would constitute a breach or default by Seller or, to the Knowledge of the Seller, any third party thereto or would permit the rescission, termination or modification of any Material Contract. Seller has not assigned any of its rights, titles or interests under any Material Contract.

**4.10** **Insurance**. Disclosure Schedule 4.10 sets forth all insurance coverages applicable to Seller or the Business. There is no claim pending by Seller under any such policies as to which coverage has been questioned, denied or disputed. All premiums payable under all such policies and bonds have been paid.

**4.11** **Litigation**. Except as set forth in Disclosure Schedule 4.11, there are no and have been no Proceedings involving Seller since the Reference Date, the Seller has not received written notice of a claim or dispute that is reasonably likely to result in any Proceeding. There is no outstanding Order of any Governmental Body to which Seller is subject.

**4.12** **Employees and Employee Benefits**.

(a) **Employees**. Disclosure Schedule 4.12(a) sets forth a complete list of all employees and independent contractors of Seller, along with the job title, location, classification (i.e., exempt or not exempt), status (e.g., part-time, full-time, seasonal or temporary), and the hourly or salary rate of compensation of each such employee or independent contractor in 2020 and any changes thereto since 2020, and any noncompetition restrictions, if any, applicable to such employees. None of Seller's employees is a party to or otherwise bound by any collective bargaining agreement, contract or other agreement or understanding with a labor union or labor organization. None of Seller's employees or independent contractors are subject to a written employment, consulting or independent contractor agreement. None of Seller's employees or independent contractors would be contractually restricted by Seller from being employed by the Buyer or its Affiliates. Seller is and has been since the Reference Date in compliance in all material respects with all Laws applicable to employment and work authorization in the United States. Each person providing services to Seller as employees or as independent contractors have been properly classified in all material respects for all purposes under the Code and ERISA and have been properly classified in all material respects as either exempt or nonexempt under applicable Law.

(b) **Employee Benefits**. Disclosure Schedule 4.12(b) lists each Employee Benefit Plan that Seller maintains or to which Seller contributes or has any obligation to contribute or with respect to which Seller and its Subsidiaries have any liabilities. Each such Employee Benefit Plan (and each related trust, insurance Contract, or fund) has been maintained, funded and administered in accordance with the terms of such Employee Benefit Plan and complies in form and in operation in all material respects with the applicable requirements of ERISA, the Code, and other applicable Laws. All contributions (including all employer contributions and employee salary reduction contributions) that are due have been made within the time periods prescribed by applicable Law.

15

**4.13     Debt**. Except as set forth on <u>Disclosure Schedule 4.13</u>, Seller does not have any Debt or other Liabilities and is not liable for any Debt or Liability of any other Person. No event of default exists under any Contracts with respect to the Debt set forth on <u>Disclosure Schedule 4.13</u>.

**4.14     Environmental Matters**. Seller has complied since the Reference Date, and is in compliance, in each case in all material respects, with all Environmental Requirements, and to the Knowledge of the Seller, have no Liabilities thereunder.

**4.15     Affiliate Transactions**. Other than as set forth on <u>Disclosure Schedule 4.15</u>, none of the Affiliates of the Seller: (a) own, directly or indirectly, any stock or other ownership interest or investment in any Person that is a competitor, supplier, customer, franchisee, lessor or lessee of Seller; (b) have any claim against or owe any amount to, or are owed any amount by, Seller (other than the owners of Seller); (c) have any interest in or own any material assets, properties or rights used in the conduct of the Business.

**4.16     Inventory**. All of the inventory and related supplies of Seller, and to the Knowledge of Seller all inventory in transit that has been purchased, including but not limited those items identified as Inventory on the Seller's financing statements ("*Inventory*"), whether located at the premises of the Seller or elsewhere, are of a quantity and quality usable and saleable in the ordinary course of business, are not in any material respects damaged or defective and are merchantable. All of the Inventory consists of bona fide assets. All of the Inventory, whether located at the premises of the Seller or elsewhere, are properly reflected on the Seller's books and records and are not the subject of any counterclaim, or a claim for a charge back, deduction, credit, set off or other offset, or any claim of a party-in-possession, such as a claim for a Lien or other restriction. All of the Inventory, whether located at the premises of the Seller or elsewhere, are in compliance with all applicable laws, including those pertaining to labeling and packaging.

**4.17     Capitalization**.  The Capitalization of Seller is as set forth on <u>Disclosure Schedule 4.17</u>.

**4.18     Sufficiency of Assets**. The Assigned Assets include all of the assets necessary to permit Lumio to conduct the Business after the Closing in a manner substantially equivalent to the manner as it is being conducted immediately prior to Closing. Except for the Excluded Assets and as set forth on <u>Disclosure Schedule 4.17</u>, no officer, director, employee or shareholder of the Seller owns any asset or property used in or pertaining to the Business.

**4.19     Restrictions on Business Activities**. There is no Contract, Order, or other instrument binding upon Seller which restricts or prohibits Seller from competing with any other Person, from engaging in any business or from conducting activities in any geographic area, or which otherwise restricts or prohibits the conduct of the business of Seller and its Subsidiaries.

Neither the Seller, its Affiliates, representatives nor advisors have made, or shall be deemed to have made, to Lumio any representation or warranty, express or implied, in connection with the transactions contemplated by this Agreement, including with respect to the Lumio Holdings Equity, other than those expressly made by the Seller in this <u>Article 4</u> and any written warranties which by their express terms are stated to be warranties and representations, if any, made by them in the Ancillary Agreements, and any such other representations or warranties are hereby disclaimed.

16

**ARTICLE 5**
**LUMIO REPRESENTATIONS AND WARRANTIES**

Lumio represents and warrants to the Seller that the statements contained in this Article 5 are correct and complete as of the Effective Date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Article 5), except as set forth in the corresponding section of the Disclosure Schedule.

**5.1** **Formation**. Lumio is a corporation duly organized under the laws of the State of Delaware. Lumio is duly authorized to conduct its business and is in good standing under the Laws of each jurisdiction where such qualification is required to operate the Business, and at Closing will be authorized to conduct the Business as has been conducted by Seller. Lumio has full entity power and authority and all Permits necessary to carry on the businesses in which it is engaged and to own, lease and use the properties owned, leased and used by it. Lumio is not in default under or in violation of any provision of its Organizational Documents.

**5.2** **Authorization**. Lumio has full power, authority and legal capacity to execute and deliver the Agreement and the Ancillary Agreements to which it is a party and to perform its obligations hereunder and thereunder. The execution and delivery by Lumio of the Agreement and the Ancillary Agreements to which it is a party and the performance by Lumio of the transactions contemplated hereby and thereby have been duly approved by all requisite organizational actions of Lumio.

**5.3** **Non-contravention**. Neither the execution and the delivery of this Agreement nor the Ancillary Agreements to which Lumio is a party, nor the consummation of the transactions contemplated hereby or thereby, will (a) violate or conflict with any Law or Order to which Lumio is subject, (b) violate or conflict with any provision of the Organizational Documents of Lumio, or (c) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice or payment under any Contract, Permit, instrument, or other arrangement to which Lumio is a party or by which it is bound or to which any of its assets is subject (or result in the imposition of any Lien upon any of its assets). Lumio is not required to give any notice to, make any filing with, or obtain any Consent or Permit of any Governmental Body or other Person in order to consummate the transactions contemplated by this Agreement or the Ancillary Agreements to which Lumio is a party.

**5.4** **Brokers' Fees**. Lumio has no Liability to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement.

**5.5** **Valid Issuance of Securities**. The Lumio Holdings Equity held by the Equity Recipients is duly and validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under this Agreement, the shareholders agreement among the Lumio shareholders, the Stock Restriction Agreements, and/or bylaws and applicable state and federal securities laws.

Neither Lumio, its Affiliates, representatives nor advisors have made, or shall be deemed to have made, to Seller any representation or warranty, express or implied, in connection with the transactions contemplated by this Agreement, including with respect to the Lumio Holdings Equity, other than those expressly made by Lumio in this Article and any written warranties which by their express terms are stated

17

to be warranties and representations, if any, made by them in the Ancillary Agreements, and any such other representations or warranties are hereby disclaimed. For clarity, any representation and warranty as to the value of the Lumio Holdings Equity is hereby disclaimed.

**ARTICLE 6**
**INDEMNIFICATION**

**6.1     Survival and Time Limitations**. All representations and warranties of the Parties shall survive this Agreement for a period of eighteen (18) months following the Closing Date.  All covenants and agreements of the Parties in this Agreement or any other certificate or document delivered pursuant to this Agreement will survive the Closing until satisfied. If the Closing occurs (a) the Seller will have no liability with respect to any claim under Section 6.2(a) unless Lumio notifies Seller of such a claim on or before eighteen (18) months after the Closing Date; provided, however, that any claim relating to any Fundamental Reps may be made at any time without limitation, and (b) Lumio will have no liability with respect to any claim under Section 6.3(a) unless Seller notifies Lumio of such a claim on or before eighteen (18) months after the Closing Date; provided, however, that any claim relating to any Fundamental Reps may be made at any time without limitation. If Seller or Lumio, as applicable, provides proper notice of a claim within the applicable time period set forth above, if any, then liability for such claim will continue until such claim is resolved.

**6.2     Indemnification by the Seller**. Subject to the terms and conditions of this Article, the Seller will indemnify and hold harmless Lumio and its Subsidiaries and its officers, managers and directors (the "*Lumio Indemnified Parties*") from and against the entirety of any Adverse Consequences that any Lumio Indemnified Party may suffer or incur (including any Adverse Consequences they may suffer or incur after the end of any applicable survival period, provided that an indemnification claim with respect to such Adverse Consequence is made pursuant to this Article prior to the end of any applicable survival period) resulting from or caused by (a) any breach or inaccuracy of any representation or warranty made by the Seller in Article 4 of this Agreement or in any Ancillary Agreement, (b) any breach of any covenant or agreement of the Seller in this Agreement or in any Ancillary Agreement, and (c) the Retained Liabilities.

**6.3     Indemnification by Lumio**. Subject to the terms and conditions of this Article, Lumio will indemnify and hold harmless the Seller and its owners, officers, managers and directors (the "*Seller Indemnified Parties*") from and against the entirety of any Adverse Consequences they may suffer or incur (including any Adverse Consequences they may suffer or incur after the end of any applicable survival period, provided that an indemnification claim with respect to such Adverse Consequence is made pursuant to this Article prior to the end of any applicable survival period) resulting from or caused by (a) any breach or inaccuracy of any representation or warranty made by Lumio in Article 5 of this Agreement or in any Ancillary Agreement, (b) any breach of any covenant or agreement of Lumio in this Agreement or in any Ancillary Agreement, and (c) the Assumed Liabilities.

**6.4     Limitations on Indemnification**.

(a)     **Basket**. With respect to the indemnification under Sections 6.2(a) and 6.3(a) with respect to breaches of representations and warranties, an Indemnifying Party will have no liability with respect to such matters until the Indemnified Party has suffered aggregate Adverse Consequences by reason of all such breaches in excess of $500,000.00 (the "*Threshold Amount*"), after which point the Indemnifying Party will be obligated to indemnify the Indemnified Party from and against all Adverse Consequences, including those comprising the Threshold Amount.

(b)     **Cap**. With respect to the indemnification under <u>Section 6.2(a)</u> or <u>Section 6.3(a)</u> with respect to breaches of representations and warranties (excluding the Fundamental Reps), the aggregate maximum liability of an Indemnifying Party shall be equal to the Post Closing Payment.

(c)     **Purchase Price Cap**. Except as otherwise expressly provided for herein, the aggregate maximum liability for which Seller shall be liable under <u>Section 6.2(a)</u> with respect to Fundamental Reps shall be an amount equal to the Total Cash Purchase Price.

(d)     **Exceptions**. The foregoing limitations shall not apply in respect of any Adverse Consequences arising out of, resulting from or relating to (i) fraud or intentional misconduct by any Indemnifying Party, or (ii) a breach by Sellers of <u>Sections 4, 6.5, or 6.6</u> of that certain Agreement Regarding Confidentiality, Non-Competition, and Assignment of Inventions which constitutes a material component of the Employment Agreements and/or <u>Section 7.7</u> of this Agreement. No Party shall be entitled to indemnification pursuant to this <u>Article 6</u> for a breach of representation or warranty under <u>Sections 6.2(a) or 6.3(a)</u> that such party had Knowledge prior to the Closing Date. For the purposes of this <u>Section 6.4(d)</u>, Knowledge shall not apply to the Fundamental Reps or taxes.

**6.5     Third-Party Claims**.

(a)     **Notice**. If a third party initiates a claim, demand, dispute, lawsuit or arbitration (a "<u>*Third-Party Claim*</u>") against an Indemnified Party with respect to any matter that the Indemnified Party might make a claim for indemnification against any Indemnifying Party under this Article, then the Indemnified Party must promptly notify the Indemnifying Party in writing of the existence of such Third-Party Claim and must deliver copies of any documents served on the Indemnified Party with respect to the Third-Party Claim; provided, however, that any failure on the part of an Indemnified Party to so notify an Indemnifying Party shall not limit any of the obligations of the Indemnifying Party under this Article except to the extent such failure actually prejudices the defense of such proceeding, it being understood and agreed that the failure of the Indemnified Party to so notify the Indemnifying Party prior to settling a Third-Party Claim (whether by paying a claim or executing a binding settlement agreement with respect thereto) or the entry of a judgment or issuance of an award with respect to a Third Party-Claim shall constitute actual prejudice to the Indemnifying Party's ability to defend against such Third-Party Claim.

(b)     **Defense by Indemnifying Party**. Upon receipt of the notice described in <u>Section 6.5(a)</u>, the Indemnifying Party will have the right to defend the Indemnified Party against the Third-Party Claim with counsel reasonably satisfactory to the Indemnified Party, provided, that (i) the Indemnifying Party notifies the Indemnified Party in writing within fifteen (15) calendar days after the Indemnified Party has given notice of the Third-Party Claim that the Indemnifying Party will indemnify the Indemnified Party from and against the entirety of any Adverse Consequences the Indemnified Party may suffer resulting from or caused by the Third-Party Claim, (ii) the Third-Party Claim involves only money damages and does not seek an injunction or other equitable relief or is asserted by any Governmental Authority and (iii) the Indemnifying Party conducts the defense of the Third-Party Claim in a manner that would be considered by a reasonable person to be active and diligent. The Indemnifying Party will keep the Indemnified Party apprised of all material developments, including settlement offers, with respect to the Third-Party Claim and

19

permit the Indemnified Party to participate in the defense of the Third-Party Claim. So long as the Indemnifying Party is conducting the defense of the Third-Party Claim in accordance with <u>Section 6.5(b)</u>, the Indemnifying Party will not be responsible for any attorneys' fees or other expenses incurred by the Indemnified Party regarding the Third-Party Claim, unless there is an actual or potential conflict of interest presented by one counsel representing both the Indemnified Party and the Indemnifying Party.

(c)    **Defense by Indemnified Party**. In the event that any of the conditions under <u>Section 6.5(b)</u> are or becomes unsatisfied, however, (i) the Indemnified Party may defend against, and consent to the entry of any judgment on or enter into any settlement with respect to, the Third-Party Claim in any manner it may reasonably deem appropriate, (ii) the Indemnifying Parties will reimburse the Indemnified Party promptly and periodically for the reasonable costs of defending against the Third-Party Claim (including reasonable attorneys' fees and expenses), and (iii) the Indemnifying Parties will remain responsible for any Adverse Consequences the Indemnified Party may suffer resulting from or caused by the Third-Party Claim to the fullest extent provided in this <u>Article 6</u>.

(d)    **Cooperation**. The Party not controlling the defense of a Third-Party Claim shall cooperate with and make available to the controlling Party such assistance and materials as may be reasonably requested by it (including copies of any summons, complaint or other pleading which may have been served on such Party and any written claim, demand, invoice, billing or other document evidencing or asserting the same). The Party controlling such Third-Party Claim shall keep the non-controlling Party reasonably advised of the status of such Third-Party Claim.

(e)    **Settlement**. Neither the Indemnified Party nor the Indemnifying Party will consent to the entry of any judgment or enter into any settlement with respect to the Third-Party Claim without the prior written consent of the other party, which consent will not be unreasonably withheld or delayed.

**6.6    Direct Claims**.

(a)    An Indemnified Party shall make any claims for indemnification pursuant to <u>Section 6.2</u> or <u>Section 6.3</u> by delivering an Officer's Certificate to the Indemnifying Party. For purposes hereof, "<u>*Officer's Certificate*</u>" shall mean a certificate signed by an officer of Lumio, in the case of an Lumio Indemnified Party, or an authorized officer of the Seller, in the case of a Seller Indemnified Party, which may be amended from time to time by reasonable advance written notice to the Indemnifying Party; and such certificate shall (i) state that the Party claiming indemnification has paid, suffered, sustained or incurred an Adverse Consequence; and (ii) specify in reasonable detail the individual items of Adverse Consequences included in the amount so stated, the date each such item was paid, suffered, sustained or incurred, or the basis for such anticipated liability.

(b)    The Indemnifying Party may make a written objection ("<u>*Objection*</u>") to any claim for indemnification. The Objection shall be delivered to the Indemnified Party within fifteen (15) calendar days after delivery of the Officer's Certificate to the Indemnifying Party. If no Objection is delivered by the Indemnifying Party to the Indemnified Party within such fifteen (15) calendar day time period, then the claim made by the Indemnified Party in the Officer's Certificate shall be

conclusively deemed to be a liability of the Indemnifying Party and the Indemnifying Party will be obligated to make payment therefor according to the terms of this Article 6.

(c)        The Indemnifying Party and the Indemnified Party shall attempt in good faith to resolve any claim for indemnification to which an Objection is made. If such parties are able to resolve any such claim for indemnification, they shall prepare and sign a memorandum setting forth such agreement. If such parties are unable to resolve such claim for indemnification, then the parties shall submit such dispute to binding arbitration in accordance with the provisions of Section 6.6(d). The Indemnifying Party shall pay to the applicable Indemnified Party by wire transfer of immediately available funds to an account designated by such Indemnified Party the agreed upon amount of the Adverse Consequences (if any) within five (5) business days of the date of the written memorandum described in the preceding sentence or the final decision of an arbitration panel as set forth in Section 6.6(d), as applicable; provided that (i) if Lumio is the Indemnifying Party, then amount of the agreed-upon Adverse Consequences (if any) shall be paid to the Seller, and (ii) if the Seller is the Indemnified Party, the amount of the agreed-upon Adverse Consequences (if any) shall be paid to Lumio, in each case, following the date of the written memorandum described above or the final decision of an arbitration panel as set forth in Section 6.6(d).

(d)        In the event of a dispute with respect to claim for indemnification to which an Objection is made that cannot be resolved by the Parties in good faith within ten (10) business days or such longer period as mutually agreed to by the Parties (the "*Arbitration Commencement Date*"), then the Parties shall submit the dispute to binding arbitration in accordance with the applicable rules of the American Arbitration Association or such other rules and procedures as the parties to the dispute may hereafter consent to in writing. Judgment upon any arbitration award may be entered into in any court having jurisdiction. Any Party to this Agreement may bring an action, including a summary or expedited proceeding, to compel arbitration of any controversy or claim under this Section 6.6 in any court having jurisdiction over such action. The arbitration will be conducted in Salt Lake City, Utah, and administered in accordance with the applicable rules of the American Arbitration Association. The arbitration panel shall consist of one arbitrator appointed by mutual agreement of the Parties, or in the event of failure to agree within ten (10) Business Days following the Arbitration Commencement Date, Lumio, on the one hand, and the Seller, on the other hand, shall each appoint an arbitrator and the two (2) arbitrators so appointed shall promptly thereafter appoint a third arbitrator, provided that if either Party fails to select an arbitrator as set forth herein within twenty (20) days from Arbitration Commencement Date, then the matter shall be resolved by the arbitrator selected by the other Party. The arbitrator(s) shall so conduct the arbitration that a final result, determination, finding, judgment and/or award in writing is made or rendered as soon as practicable, but in no event later than thirty (30) Business Days after appointment of the arbitration panel, subject to any reasonable delay due to unforeseen circumstances. The arbitration award shall be given in writing, shall provide reasons for the decision, shall be signed by the single arbitrator or a majority of the arbitrators, as the case may be, appointed hereunder, shall be final and binding on the Parties, shall not be subject to any appeal, and shall deal with the question of costs of the arbitration and all related matters. Each Party will bear its own costs and expenses of arbitration; provided, however, that, notwithstanding anything to the contrary in this Section 6.6, the arbitrators shall have the authority to award fees and other costs of the arbitration as determined by the single arbitrator or by a majority of the arbitrators, as the case may be. Notwithstanding the above, any Party may seek equitable relief permitted by this Agreement from any court of competent jurisdiction.

21

**6.7**      **Other Indemnification Matters**.

(a)      **Adjustments**. All indemnification payments under this Article will be deemed adjustments to the consideration payable under this Agreement.

(b)      **Insurance**. The amount of any Adverse Consequences will be computed net of any insurance proceeds actually received by the Indemnified Party in connection therewith, less the costs of any such recovery, including increases in premiums as a result of such recovery, collection expenses and deductibles and other Adverse Consequences incurred by such Indemnified Party as a result of such claim.

(c)      **Materiality**. For purposes of determining the amount of Adverse Consequences resulting therefrom, all qualifications or exceptions in any representation or warranty relating to or referring to the terms "material", "materiality", "in all material respects", "Material Adverse Effect" or any similar term or phrase shall be disregarded.

(d)      **No Consequential Damages**. NOTWITHSTANDING ANYTHING TO THE CONTRARY ELSEWHERE IN THIS AGREEMENT OR PROVIDED FOR UNDER ANY APPLICABLE LAW, IN NO EVENT SHALL ANY INDEMNIFYING PARTY BE LIABLE TO ANY INDEMNIFIED PARTY FOR ANY PUNITIVE, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR INDIRECT DAMAGES, INCLUDING LOSS OF FUTURE REVENUE OR INCOME, LOSS OF BUSINESS REPUTATION OR OPPORTUNITY RELATING TO THE BREACH OR ALLEGED BREACH OF THIS AGREEMENT, OR DIMINUTION OF VALUE OR ANY DAMAGES BASED ON ANY TYPE OF MULTIPLE; PROVIDED, HOWEVER, THAT NOTHING HEREIN SHALL PREVENT ANY LUMIO INDEMNIFIED PARTY OR SELLER INDEMNIFIED PARTY FROM BEING INDEMNIFIED PURSUANT TO THIS ARTICLE 6 FOR ALL COMPONENTS OF AWARDS AGAINST THEM IN THIRD PARTY CLAIMS FOR WHICH INDEMNIFICATION IS PROVIDED PURSUANT TO THIS ARTICLE 6.

(e)      **Exclusive Remedy**. Other than any rights that a Party may have for non-monetary equitable relief, the provisions of this Article are the exclusive remedy of the Parties for a breach of this Agreement.

**6.8**      **Offset**. After following the procedures set forth in Section 6.5, Section 6.6 or any other applicable procedure in this Agreement, Lumio and its Affiliates, upon prior written notice to the Seller, will be entitled, but not obligated, to recover any amounts not in dispute and due from the Seller under this Agreement by setting off such amounts against any amounts otherwise payable to Sellers by Lumio or its Affiliates. Neither the exercise nor the failure to exercise such right of offset will constitute an election of remedies or limit Lumio in any manner in the enforcement of any other remedies that may be available to them.

**ARTICLE 7**
**CERTAIN ADDITIONAL AGREEMENTS**

**7.1**      **Operation of the Business Prior to the Closing Date**. From the date hereof until the Closing Date, Seller agrees that the Business will be conducted solely in the Ordinary Course of Business. Without limiting the generality of the foregoing, Seller will not execute any Material Agreements or incur any Material Debt outside the ordinary course of business without Lumio's prior written consent.

**7.2**     **Access and Information**. Prior to Closing, the Seller Parties and Lumio agree to provide the other with reasonable access at reasonable times to the books, records, employees and franchisees of the other, and to reasonably respond to the reasonable requests for information, in connection with their due diligence investigation of the consummation of the transactions contemplated hereby. Lumio will keep the information obtained pursuant to this Section 7.2 confidential, and shall cause its directors, officers, employees, representatives and advisors who receive any portion thereof to keep all such information confidential, except as may otherwise be required by Law.

**7.3**     **Notification of Certain Matters**. Prior to Closing, the Seller and Lumio, as applicable, will give the other prompt written notice of (a) any knowledge of or discovery by the notifying Party of the inaccuracy of any representation or warranty by the notifying Party contained in this Agreement or any material failure of the notifying Party to comply with or satisfy any covenant or agreement to be complied with or satisfied by such Party hereunder (and each party shall use commercially reasonable efforts to remedy such failure), and (b) the receipt of any notice or other communication from any Governmental Body or any third party that would be reasonably expected to cause the notifying Party to fail to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by such Party under this Agreement; provided that the delivery of any notice pursuant to this Section shall not limit or otherwise affect the remedies available hereunder to the Party receiving such notice.

**7.4**     **Certain Post-Closing Matters**. Seller agrees to pay or perform when due the Retained Liabilities. All Transfer Taxes will be shared equally by Lumio and the Seller. Lumio or their Affiliates may, but are not required to, make an offer of any employment to any individual who is or was employed by the Seller, and if any such employee is hired by Lumio or their Affiliates, such employee will be released from any noncompetition or confidentiality obligations owed to the Seller or its Affiliates. At or after Closing, Seller agrees to obtain "tail" insurance coverage for the Business for a period of up to one (1) year and on other terms reasonably satisfactory to the Parties. If After Closing, Seller or its Affiliates receives any monies belonging to Lumio or its Affiliates (including with respect to any Assigned Assets), Seller will pay or cause their Affiliates to promptly pay such monies over to Lumio, and if Lumio or its Subsidiaries receives any monies belonging to the Seller or its Affiliates (including with respect to any Excluded Assets), Lumio will pay or cause its Subsidiaries to promptly pay such monies over to Seller.

**7.5**     **Further Assurances**. Both before and after Closing, each of the Parties to this Agreement, at the reasonable request of another Party hereto, will execute and deliver such other instruments and do and perform such other acts and things as may be reasonably necessary or desirable for effecting the consummation of this Agreement and the transactions contemplated hereby. The Seller Parties acknowledge and agree that from and after the Closing, Lumio and its Affiliates will be entitled to copies of all documents, books, records (including Tax records), agreements and financial data relating to the Business, and the Seller agrees to preserve all such information for at least six years and will provide reasonable access to (with a right to copy) such information to Lumio and its Affiliates.

**7.6**     **Confidentiality**. At Closing the mutual confidentiality agreement executed by Lumio and Seller will terminate. After Closing, Seller agrees not to disclose or use any Confidential Information, except that if and as long as a Seller s providing services to Lumio or its Affiliates, Seller may use the Confidential Information in the ordinary course of providing such services on behalf of Lumio or its Affiliates so long as such use is in compliance with all policies and agreements applicable to the Seller. "*Confidential Information*" means any information concerning the business and affairs of Lumio or its Affiliates, except information that is (a) already generally available to the public; or (b) lawfully acquired by the Seller, any of its Affiliates or its directors, officers, employees or agents from and after the Closing

23

from sources that are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. If a Seller or any of its Affiliates or their respective directors, officers, employees or agents are compelled to disclose any Confidential Information by judicial or administrative process or by other requirements of Law, the Seller shall promptly notify Lumio in writing so that Lumio may seek a protective order or other appropriate remedy, at Lumio's sole expense. The Seller will cooperate with Lumio, at Lumio's expense, in any attempt by Lumio to obtain any such protective order or other remedy.

**7.7** **Covenant Not to Compete**. From and after the Closing, the Seller covenants and agrees as follows:

(a) **Restricted Period and Restricted Area**. "*Restricted Period*" means the period commencing on the Closing Date and continuing until the date that is the four-year anniversary of the Closing Date. "*Restricted Area*" means the geographic boundaries of the United States of America.

(b) **Noncompetition**. During the Restricted Period and except on behalf of Lumio and its Subsidiaries, the Seller will not, directly or indirectly, in any manner (whether on the Seller's own account, or as an owner, operator, manager, consultant, officer, director, employee, investor, agent or otherwise), anywhere in the Restricted Area, engage directly or indirectly in the Business, or own any interest in, manage, control, participate in (whether as an owner, operator, manager, consultant, officer, director, employee, investor, agent, representative or otherwise), or consult with or render services for any Person that is engaged in the Business; provided, however, that no owner of less than 2% of the outstanding stock of any publicly traded corporation shall be deemed to engage solely by reason thereof in its business.

(c) **Nonsolicit**. During the Restricted Period, the Seller will not, directly or indirectly, in any manner (whether on his own account, as an owner, operator, manager, consultant, officer, director, employee, investor, agent or otherwise), (a) call upon, solicit or provide services to any Person that is or was affiliated with Seller in any way with the intent of selling or attempting to sell services related to the Business, (b) hire or engage or recruit, solicit or otherwise attempt to employ or engage or enter into any business relationship with any Person employed by Lumio or any of its Subsidiaries, or induce or attempt to induce any Person to leave such employment, or (c) in any way interfere with the relationship between Lumio or its Subsidiaries and any employee, vendor or other Person with a current, former or prospective business relationship with Lumio or its Subsidiaries (including, without limitation, by making any negative or disparaging statements or communications regarding Lumio, any of its Subsidiaries or any of their operations, officers, directors or investors); provided, however, that this shall not preclude (i) the use by the Seller or any of its Affiliates of a general solicitation (such as a newspaper advertisement or on internet, radio or television) not specifically directed to any Person employed by Lumio or any of its Subsidiaries or any Person that is or was a franchisee of Seller or of Lumio or its Subsidiaries or (ii) hiring any former employee or franchisee of Lumio, its Subsidiaries or Seller, whose employment or contract with Lumio, its Subsidiaries or Seller was terminated, so long as, for the avoidance of doubt, such former employee or franchisee is hired or contracted to work in the Business.

(d) **Enforcement**. If the final judgment of a court of competent jurisdiction declares that any term or provision of this Section is invalid or unenforceable, the Parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to

24

replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closer to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed. The Restricted Period shall be tolled, and therefore extended, during any period of non-compliance by Seller. In the event of litigation involving this Section, the non-prevailing party shall reimburse the prevailing party for all costs and expenses, including reasonable attorneys' fees and expenses, incurred in connection with any such litigation, including any appeal therefrom. The existence of any claim or cause of action by the Seller or any of their Affiliates, whether predicated on this Agreement or otherwise, will not constitute a defense to the enforcement by Lumio of the provisions of this Section 7.7.

(e)     **Injunctive Relief**. The Seller hereby agrees that in the event of breach of this Section 7.7, damages would be difficult, if not impossible, to ascertain, that irreparable damage would occur in the event that any of the provisions of this Section 7.7 were not performed in accordance with their specific terms or were otherwise breached, and that the character, periods and geographical area and the scope of the restrictions on the Seller activities in this Section 7.7 are fair and reasonably required for the protection of Lumio and its Affiliates. It is accordingly agreed that, in addition to and without limiting any other remedy or right they may have, Lumio will be entitled to seek an injunction or other equitable relief in any court of competent jurisdiction, without any necessity of proving damages or any requirement for the posting of a bond or other security, enjoining any such breach of this Section 7.7, and enforcing specifically the terms and provisions.

**7.8     Continuing Assistance**. Subsequent to the Closing, the Parties shall, at their own cost, assist each other (including making records available) in the preparation of their respective Tax Returns and the filing and execution of Tax elections, if required, as well as any audits or litigation that ensue as a result of the filing thereof, to the extent that such assistance is reasonably requested.

**7.9     Termination of Competing Identities**. No later than 30 days from the Closing Date, Seller shall take all such steps as may be necessary to effect the following:

(a)     either: (i) change the corporate name of the Seller and its Affiliates so that it does not include any reference to Zenith Security, LLC, Zenith Solar, LLC, or DECA Living, LLC or any similar identifications or (ii) dissolve the Seller or its Affiliates that include any reference to Zenith Security, LLC, Zenith Solar, LLC, or DECA Living, LLC or any similar identifications in such Person's corporate or company name; and

(b)     terminate or transfer to Lumio (at Lumio's discretion) all d/b/a or other fictitious name filings held by Seller or the Seller's Affiliate that include any reference to Zenith Security, LLC, Zenith Solar, LLC, DECA Living, LLC or any similar identifications.

**ARTICLE 8**
**GENERAL**

**8.1     Press Releases and Public Announcements**. No Party shall issue any press release or make any public announcement relating to the subject matter of this Agreement without the prior written approval of Lumio; provided, however, that any Party may make any public disclosure it believes in good faith is required by applicable Law (in which case the disclosing Party will use its reasonable best efforts to advise the other Parties prior to making the disclosure). Notwithstanding the foregoing, after the

Closing, Lumio shall be permitted to issue press releases, make public announcements and communicate with employees and Franchisees without the consent or participation of Seller, provided that Seller shall in good faith be granted the right to review and comment on such communications prior to their publication.

**8.2** **Conflict Waiver and Attorney-Client Privilege**.  Each of the Parties hereto acknowledges and agrees, on its own behalf and on behalf of its directors, members, shareholders, partners, officers, employees and Affiliates, that: (i) Dentons ("Buyer Counsel") has acted as counsel only to Buyer in connection with this Agreement and the transactions contemplated herein and for no other party, including the Parties. Each of the Parties agrees that following the execution of this Agreement, such representation and any prior representation of the Parties herein shall not preclude Buyer Counsel from serving as counsel to Buyer or any director, member, shareholder, partner, officer or employee of any Party herein, in connection with any litigation, claim, obligation, or other matter arising out of or relating to this Agreement or the transactions contemplated by this Agreement; and (ii) Seller shall not seek to have Buyer Counsel disqualified from any such representation for any reason. Each of the Parties hereto hereby consents thereto and waives any conflict of interest arising in connection with this Agreement, and each of such Parties shall cause any of its Affiliates to consent to waive any conflict of interest arising from this Agreement. Each of the Parties acknowledges that such consent and waiver is voluntary, that it has been carefully considered, and that the Parties have consulted with counsel of their choosing or have been advised they should do so in connection herewith. The covenants, consent and waiver contained in this Section 8.2 shall survive the Closing Date and not be deemed exclusive of any other rights to which Buyer Counsel is entitled whether pursuant to law, contract, or otherwise.

**8.3** **No Third-Party Beneficiaries**. This Agreement shall not confer any rights or remedies upon any Person other than the Parties, the Equity Recipient, and their respective successors and permitted assigns.

**8.4** **Entire Agreement**. This Agreement (including the documents referred to herein) constitutes the entire agreement among the Parties and supersedes any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

**8.5** **Succession and Assignment**. This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns. No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Party, which consent shall not be unreasonably withheld or delayed.

**8.6** **Counterparts**. This Agreement may be executed in one or more counterparts (including by means of facsimile or portable document format (PDF)), each of which shall be deemed an original but all of which together will constitute one and the same instrument.

**8.7** **Headings**. The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

**8.8** **Notices**. All notices, requests, demands, claims, and other communications hereunder will be in writing. Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient, (b) when sent by electronic mail or facsimile and a confirmation of receipt is received, on the date of transmission to such recipient, (c) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), or (d) four

26

Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

| | |
|---|---|
| If to Seller: | Zenith Security, LLC / Zenith Solar, LLC / DECA Living, LLC<br>Attention: Oscar Luna or John Bankhead<br>2000 East Lamar Boulevarad, Suite 300<br>Arlington, TX  76006 |
| With Copy to (*which such copy shall not constitute notice*): | Andrew Rohne<br>Center for Legal Financial and Tax Planning, Inc<br>4501 West DeYoung Street, Suite 200<br>Marion, IL  62959<br>andrew@taxplanning.com |
| If to the Buyer: | Lumio HX, Inc.<br>Attention: Greg Butterfield, CEO<br>1550 West Digital Drive, Suite 500<br>Lehi, Utah 84043<br>greg@lumio.com |
| With Copy to (*which such copy shall not constitute notice*): | Lumio HX, Inc.<br>Attention: Travis Marc Wilson, General Counsel / Chief Legal Officer<br>1550 West Digital Drive, Suite 500<br>Lehi, Utah 84043<br>travis@lumio.com |
| With Copy to (*which such copy shall not constitute notice*): | Dentons<br>Attention: Travis Marc Wilson, Esq.<br>111 South Main Street, Suite 2400<br>Salt Lake City, Utah 84111<br>travis.m.wilson@dentons.com |

Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties notice in the manner herein set forth.

**8.9      Governing Law; Jurisdiction**. This Agreement shall be governed by and construed in accordance with the domestic Laws of the State of Delaware without giving effect to any choice or conflict of Law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware. Each of the Parties submits to the jurisdiction of the State of Utah and the Federal District Court for the District of Utah in any action or proceeding arising out of or relating to this Agreement and agrees that all claims in respect of the action or proceeding shall be heard and determined in any such court. Each Party also agrees not to bring any action or proceeding arising out of or relating to this Agreement in any other court. Nothing in this Section, however, shall affect the right of any Party to serve legal process in any other manner permitted by law or at equity. Each Party agrees that a final judgment in any action or proceeding so brought shall be conclusive and may be enforced by suit on the judgment or in any other manner provided by law or at equity.

**8.10**    **Amendments and Waivers**. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by the Parties. No waiver by any Party of any provision of this Agreement or any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

**8.11**    **Severability**. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

**8.12**    **Expenses.**    Each Party will bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

**8.13**    **Construction**. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" shall mean including without limitation.

**8.14**    **Schedules**. The Schedules identified in this Agreement are incorporated herein by reference and made a part hereof. Nothing in the Schedules hereto shall be deemed adequate to disclose an exception to a representation or warranty made herein unless the Schedule identifies the exception with reasonable particularity and describes the relevant facts in reasonable detail. Without limiting the generality of the foregoing, the mere listing (or inclusion of a copy) of a document or other item shall not be deemed adequate to disclose an exception to a representation or warranty made herein (unless the representation or warranty has to do with the existence of the document or other item itself). The Parties intend that each representation, warranty, and covenant contained herein shall have independent significance. If any Party has breached any representation, warranty or covenant contained herein in any respect, the fact that there exists another representation, warranty or covenant relating to the same subject matter (regardless of the relative levels of specificity) which the Party has not breached shall not detract from or mitigate the fact that the Party is in breach of the first representation, warranty, or covenant.

**8.15**    **Waiver of Jury Trial**. EACH OF THE PARTIES WAIVES THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OR RELATED TO THIS AGREEMENT IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY OF THE PARTIES AGAINST ANY OTHER PARTY OR ANY AFFILIATE OF ANY OTHER SUCH PARTY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS OR OTHERWISE. THE PARTIES AGREE THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT OR ANY PROVISION HEREOF. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.

*[SIGNATURE PAGE TO FOLLOW]*

29

IN WITNESS WHEREOF, the Parties hereto have executed this Asset Purchase Agreement as of the date first above written.

**Lumio HX, Inc.,** a Delaware corporation

DocuSigned by:

*Greg Butterfield*

—4E3712D9FA7747E…

By: Greg Butterfield

Its: CEO

**Zenith Security, LLC,** an Idaho limited liability company

DocuSigned by:

*Oscar Luna*

—495B7C565DEC4A4…

By:   Oscar Luna

Its:  CEO

**Zenith Solar, LLC,** a Texas limited liability company

DocuSigned by:

*Oscar Luna*

—495B7C565DEC4A4…

By:  Oscar Luna

Its:  CEO

**DECA Living, LLC,** a Texas limited liability company

DocuSigned by:

*Oscar Luna*

—495B7C565DEC4A4…

By:  Oscar Luna

Its: CEO

SLC_5648894.1

## DEFINITIONS

**Definitions**. For purposes of this Agreement, the following defined terms have the following meanings:

"*AK*" means Atlantic Key Energy, LLC and is defined in Section 3.3.

"*Arbitration Commencement Date*" is defined in Section 6.6(d).

"*Adverse Consequences*" means all actions, suits, proceedings, hearings, investigations, charges, complaints, claims, demands, orders, dues, penalties, fines, costs, amounts paid in settlement, liabilities, obligations, Taxes, Liens, losses, damages, deficiencies, costs of investigation, court costs, and other expenses (including interest, penalties and reasonable attorneys' fees and expenses, whether in connection with Third Party Claims or claims among the Parties related to the enforcement of the provisions of this Agreement).

"*Affiliate*" of any Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person. For purposes of this definition, "control" of a Person means the power to, directly or indirectly, direct or cause the direction of the management and policies of such Person whether through ownership of voting securities or other ownership interests, by Contract or otherwise. In the case of an individual, Affiliate includes the spouse of such an individual. The Seller will not be deemed an Affiliate of Lumio for purpose of this Agreement.

"*Agreement*" is defined in the preamble.

"*Ancillary Agreements*" means all of the agreements being executed and delivered pursuant to this Agreement, including the Employment Agreements.

"*Arbitration Commencement Date*" is defined in Section 6.6(d).

"*Assigned Assets*" is defined in the Introduction.

"*Assigned Material Contracts*" is defined in Section 1.1(a)

"*Assumed Liabilities*" is defined in Section 1.3(b).

"*Assignment and Assumption Agreement*" is defined in Section 3.2(a).

"*Bill of Sale*" is defined in Section 3.2(a).

"*Business Day*" means any day that is not a Saturday, Sunday or any other day on which banks are required or authorized by Law to be closed in Utah.

"*Business*" is defined in the Introduction.

"*Closing Date*" is defined in Section 3.1.

"*Closing*" is defined in Section 3.1.

3

"Closing Cash Purchase Price" is defined in Section 2.1(b).

"*Company*" is defined in the Introduction.

"*Company Intellectual Property*" is defined in Section 4.3(b).

"*Company Proprietary Rights*" is defined in the Introduction.

"*Company's Knowledge*" is defined in Article 4.

"*Confidential Information*" is defined in Section 7.6.

"*Consent*" means, with respect to any Person, any consent, approval, authorization, permission or waiver of, or registration, declaration or other action or filing with or exemption by such Person.

"*Contract*" means any written or oral contract, lease, license, indenture, undertaking or other agreement, in each case, that is currently valid and legally binding.

"*Debt*" means any (a) obligations relating to indebtedness for borrowed money, (b) obligations evidenced by bonds, notes, debentures or similar instruments, (c) obligations in respect of capitalized leases, (d) obligations in respect of banker's acceptances, performance bonds or letters of credit, (e) obligations for the deferred purchase price of property or services (other than current accounts payable to suppliers and similar accrued liabilities incurred in the Ordinary Course of Business, paid in a manner consistent with industry practice), (f) other long term or non-ordinary course liabilities**,** (g) indebtedness or obligations of the types referred to in the preceding clauses (a) through (f) of any other Person secured by any Lien on any assets of a Person, (h) obligations in the nature of guarantees of obligations of the type described in clauses (a) through (f) above of any other Person, (i) obligations in respect of interest under any existing interest rate swap or hedge agreement entered into by a Person, and (j) any obligation for amounts owed to any Person under any noncompetition, severance, change of control, retention, stay put or similar arrangement, whether triggered prior to or at the Closing, in each case together with all accrued interest thereon and any applicable prepayment, breakage or other premiums, fees or penalties.

"*Effective Date*" is defined in the Preamble.

"*Employment Agreements*" is defined in Section 3.2(x).

"*Employee Benefit Plan*" means any (a) qualified or nonqualified employee pension benefit plan or deferred compensation or retirement plan or arrangement, employee welfare benefit plan, or other employee benefit plan (as such terms are defined in ERISA), or (b) equity-based plan or arrangement (including any stock option, stock purchase, stock ownership, stock appreciation or restricted stock plan) or other retirement, severance, termination, retention, change of control, bonus, profit-sharing or incentive or other plan or arrangement of any kind, whether written or unwritten.

4

"*Enforceability Exceptions*" means enforceable except as limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar Laws relating to creditors' rights generally.

"*Environmental Requirements*" shall mean all Laws concerning public health and safety, worker and occupational health and safety, natural resources and pollution or protection of the environment, including all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control, or cleanup of any hazardous substances, materials, or wastes, chemical substances, or mixtures, pesticides, pollutants, contaminants, toxic chemicals, petroleum products or byproducts, fuel oil products and byproducts, mold, asbestos, polychlorinated biphenyls, noise, or radiation.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended, and any applicable rules and regulations thereunder, and any successor to such statute, rules or regulations.

"*Excluded Assets*" is defined in Section 1.2.

"*Fiera Comox*" is defined in Section 2.1(b)(iii)(A).

"*Fundamental Reps*" means the representations and warranties made (a) by the Seller in Sections 4.1 through 4.6 and Section 4.14, and (b) by Lumio in Sections 5.1 through 5.5.

"*Governmental Body*" means any foreign or domestic federal, state or local government or quasi-governmental authority or any department, agency, subdivision, court or other tribunal of any of the foregoing.

"*Illegal Payments*" means payments to any officer or employee of any Governmental Body, or any employee, customer or supplier, or any unlawful contributions, payments, expenditures or gifts; in violation of applicable Law.

"*Indemnified Party*" means, collectively, Lumio Indemnified Parties or Seller Indemnified Parties, as applicable, indemnified by an Indemnifying Party under this Agreement.

"*Indemnifying Party*" means, collectively, the Seller or Lumio, as applicable, indemnifying an Indemnified Party under this Agreement.

"*Intellectual Property*" means all intellectual property rights of any type or nature, whether established by Law or contractual agreement, however, denominated, throughout the world, including trademarks, trade names, service marks, service names, mark registrations, logos, assumed names, domain names, the goodwill in any of the foregoing; works of authorship, registered and unregistered copyrights, software, data, databases; technology, inventions, trade secrets, patents and patent applications, moral rights, rights of privacy and publicity, along with all rights to prosecute and perfect the same through administrative prosecution, registration, recordation, or other administrative proceeding, and all choses in action and rights to sue or seek other remedies arising from or relating to the foregoing.

5

"*Interim Balance Sheet Date*" is defined in Section 4.5(a).

"*Inventory*" has the meaning set forth in Section 4.15.

"*Knowledge*" means, (a) in the case of the Seller, the knowledge of Oscar and John, in each case, after reasonable inquiry of those representatives of Seller who are reasonably likely to have actual knowledge of the applicable subject matter, and (b) in the case of Lumio, the knowledge of Greg Butterfield and Wendell Laidley, after reasonable inquiry of those representatives of Lumio who are reasonably likely to have actual knowledge of the applicable subject matter.

"*Law*" means, with respect to any Person, any statute, law (including common law), code, treaty, ordinance, rule or regulation of any Governmental Body applicable to such Person.

"*Liability*" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including any liability for Taxes.

"*Licensed Software*" means all computer, software or firmware programs, modules or libraries licensed to any Company or any of its Affiliates and incorporated into or used by any Company or its Affiliates in, to develop, to maintain or to support any of the products or services of the Business.

"*Lien*" means any lien, mortgage, pledge, encumbrance, security interest, adverse claim, liability, interest, preference, priority, proxy, transfer restriction (other than restrictions under the securities laws), encroachment, Tax, Order, community property interest, equitable interest, option, warrant, right of first refusal, easement, profit, license, servitude, right of way, covenant or zoning restriction.

"*Lift*" means Lift Energy Construction, Inc. and is defined in Section 3.3.

"*Lumio Indemnified Parties*" is defined in Section 6.2.

"*Lumio Holdings Equity*" is defined in Section 2.2(a).

"*Lumio*" is defined in the preamble.

"*Material Adverse Effect*" or "*Material Adverse Change*" means any event, change, development, or effect that, individually or in the aggregate, will or would reasonably be expected to have a materially adverse effect of at least $25,000.00 on (a) the business, operations, assets (including intangible assets), liabilities, prospects, operating results, value, employee, customer or supplier relations, or financial condition of an entity or any of its Subsidiaries, or (b) the ability of any of the Parties to consummate timely the transactions contemplated by this Agreement, other than, in each case, any changes, circumstances, events or conditions resulting, directly or indirectly, from: (i) changes in general economic conditions in any of the markets in which the Business operates; (ii) any change in economic conditions or the financial, banking, currency or capital markets in general; (iii) acts of God or other calamities, national or international political or social conditions, including the engagement by any country in hostilities, whether commenced before or after the date of this Agreement, and whether or not pursuant to the declaration of a national emergency or war, or the

occurrence of any military or terrorist attack; (iv) changes accounting principles or requirements; (v) any actions taken, failures to take action, or other changes or events relating to Seller to which Lumio has consented in writing; or (vi) the taking of any action contemplated by this Agreement or the Ancillary Agreements.

"*Material Contracts*" means all Contracts of the Seller (a) related to Debt, (b) related to the acquisition of a business, (c) involving more than $50,000 (other than the purchase of inventory in the Ordinary Course of Business); (d) imposing a material restriction on competition or other business activities, (e) involving the licensing of Intellectual Property, (f) the leasing of real property, and (g) any other Contract not entered into the Ordinary Course of Business and which is material to the Seller.

"*Objection*" is defined in Section 6.6(b).

"*Oscar*" is defined in Section 2.2.

"*Officer's Certificate*" in defined in Section 6.6(a).

"*Order*" means any order, award, decision, injunction, judgment, ruling, decree, charge, writ, subpoena or verdict entered, issued, made or rendered by any Governmental Body or arbitrator.

"*Ordinary Course of Business*" means the ordinary course of business consistent with past custom and practice (including with respect to quantity and frequency).

"*Organizational Documents*" means (a) any certificate or articles of incorporation, bylaws, certificate or articles of formation, operating agreement or partnership agreement, (b) any documents comparable to those described in clause (a) as may be applicable pursuant to any Law and (c) any amendment or modification to any of the foregoing.

"*Owned Software*" means all computer, software or firmware programs, modules or libraries owned or purported to be owned by any Company or any of its Affiliates.

"*Parties*" means the parties to this Agreement.

"*Permit*" means any license, import license, export license, franchise, Consent, permit, certificate, certificate of occupancy or Order issued by any Person.

"*Permitted Lien*" means (i) any Lien for current Taxes that are not yet due or payable, (ii) any minor imperfection of title or similar Lien which individually or in the aggregate with other such Liens does not materially impair the value of the property subject to such Lien or the use of such property in the conduct of the Business, (iii) mechanics', materialmen's, landlords', workmen's, repairmen's, warehousemen's and carriers' Liens and other similar Liens that are incurred in the ordinary course of business, (iv) requirements incurred or other Liens relating to deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance, social security, and other similar statutory requirements, (v) Liens constituted by the terms of any Assigned Contract, (vii) Liens, deposits, or pledges to secure the performance of bids, tenders, Contracts (other than Contracts for the payment of money), leases, public or statutory obligations, surety, stay, appeal, indemnity, performance or other similar bonds, or other similar obligations arising in the ordinary course of business and (viii) easements, rights-of-way, restrictions, and other similar Liens which, in

the aggregate, do not materially interfere with the occupation, use, and enjoyment by Lumio of the property or assets encumbered thereby in the normal course of business or materially impair the value of the property subject thereto.

"*Person*" means any individual, entity or Governmental Body.

"*Post-Closing Payment*" is defined in Section 2.1(b).

"*Proceeding*" means any action, audit, lawsuit, litigation, investigation or arbitration (in each case, whether civil, criminal or administrative) pending by or before any Governmental Body or arbitrator.

"*Reference Date*" means the Effective Date.

"*Registered Intellectual Property*" shall mean patents, patent applications, registered copyrights, registered marks (including trademarks, service marks, and trade dress, to the extent registered), applications to register marks, registered domain names, and registered industrial designs that are material to the conduct of the Business as currently conducted.

"*Required Consents*" is defined in Section 4.1(e).

"*Restricted Area*" is defined in Section 7.7(a).

"*Restricted Cash*" means an amount reserved by Buyer from the Purchase Price payable to Sellers at Closing for any Seller's Liabilities which must be paid as of the Closing Date and Buyer's Transaction Expenses.

"*Restricted Period*" is defined in Section 7.7(a).

"*Retained Liabilities*" is defined in Section 1.3(a).

"*Secretary's Certificate*" is defined in Section 3.2.

"*Seller*" is defined in the preamble.

"*Seller Group of Companies*" is defined in Section 3.3.

"*Shareholder*" is defined in the preamble.

"*Subsidiary*" means, with respect to any Person, any corporation, limited liability company, partnership, association, or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof or (b) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or

8

Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any manager, management board, managing director or general partner of such business entity (other than a corporation). The term "*Subsidiary*" shall include all Subsidiaries of such Subsidiary.

"*Target Date*" is defined in <u>Section 3.1</u>.

"*Tax Return*" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"*Tax*" or "*Taxes*" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"*Third-Party Claim*" is defined in <u>Section 6.5(a).</u>

"*Threshold Amount*" is defined in <u>Section 6.4(a)</u>.

"*Total Cash Purchase Price*" is defined in <u>Section 2.1</u>.

"*Transaction Expenses*" means the aggregate amount of all out-of-pocket fees and expenses incurred by or on behalf of, or paid or to be paid, by either Lumio in connection with the transaction contemplated by this Agreement or otherwise relating to the negotiation, preparation, or execution of this Agreement and any Ancillary Agreements or any other performance or consummation of any actions contemplated thereby.

"*Transfer Taxes*" means any Taxes that may be imposed on the assignment of the Assigned Assets.

"*White Oak*" is defined in Section 2.1(b)(iii)(A).

**LIST OF EXHIBITS AND SCHEDULES**

**Exhibits:**

| | |
|---|---|
| Exhibit A | Shareholders |
| Exhibit B | List of Ancillary Agreements |
| Exhibit C | Secretary's Certificate |

**Schedules:**

| | |
|---|---|
| Schedule 1.1(a)(i) | Assigned Material Contracts |
| Schedule 1.1(a)(iv) | Inventory |
| Schedule 1.1(a)(v) | Vehicles, Equipment, and Tools |
| Schedule 1.1(a)(viii) | Purchase Orders |
| Schedule 1.1(a)(x) | Contracts |
| Schedule 1.1(a)(xi) | Leased Real Property and Leased Personal Property and Equipment |
| Schedule 1.2(a) | Seller's Bank Accounts, Cash, and Cash Equivalents |
| Schedule 1.2(b) | Excluded Owned Property and Office Equipment |
| Schedule 1.2(h) | Excluded Assets, Properties, and Rights |
| Schedule 2.1(a) | Allocation of Total Cash Purchase Price |
| Schedule 3.2(a)(xii) | Liens |
| Disclosure Schedule 4.1(d) | Capitalization |
| Disclosure Schedule 4.1(e) | Required Consents |
| Disclosure Schedule 4.3 | Data |
| Disclosure Schedule 4.4(a) | Registered Intellectual Property |
| Disclosure Schedule 4.4(c) | Changes |
| Disclosure Schedule 4.4(f) | Software |
| Disclosure Schedule 4.9(a) | Material Contracts |
| Disclosure Schedule 4.10 | Insurance |
| Disclosure Schedule 4.11 | Litigation |
| Disclosure Schedule 4.12(a) | Employees |
| Disclosure Schedule 4.12(b) | Employee Benefit Plans |
| Disclosure Schedule 4.13 | Debt |
| Disclosure Schedule 4.15 | Affiliate Transactions |
| Disclosure Schedule 4.16 | Sufficiency of Assets |
| Disclosure Schedule 5.3 | Capitalization of Buyer |

**EXHIBIT A**
**SHAREHOLDERS**

<u>Zenith Solar, LLC and Deca Living, LLC</u>

1. John Bankhead
2. Oscar Luna

<u>Zenith Security, LLC</u>

1. Oscar Luna

SLC_5684608.1

**EXHIBIT B**
**LIST OF ANCILLARY AGREEMENTS**

1. Bills of Sale
2. Confidentiality Agreement
   a. John Bankhead
   b. Oscar Luna
3. Employment Agreement
   a. John Bankhead
   b. Oscar Luna
4. Omnibus Assignment and Assumption Agreement
5. Stockholders Agreement
6. Stock Restriction Agreement
   a. John Bankhead
   b. Oscar Luna

SLC_5684608.1